Filed 6/22/15  Vait  v. Tanchuck CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ANNETTE VAIT, | B254506 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. SC115774) |
| v. | |
| MARSHAL TANCHUCK, as successor trustee, etc., | |
| Defendant and Respondent; | |
| DONIGER / BURROUGHS et al., | |
| Interveners and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gerald Rosenberg, Judge.  Affirmed.

Klapach & Klapach and Joseph S. Klapach for Plaintiff and Appellant.

Doniger / Burroughs and Stephen M. Doniger for Interveners, Defendants, and Respondents.

_____

The trial court granted a motion for nonsuit at the close of plaintiff's opening statement. We conclude that plaintiff has not shown the existence of reversible error, and we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The litigation involves a commercial lease for a portion of a building in Venice. The building was owned by Samuel and Betty Tanchuck as trustees of the Samuel and Betty Tanchuck Living Trust of 12-2-1996 (the Trust). In October 2009, the Tanchucks leased the eastside of the building to plaintiff Annette Vait and her then business partner Dustin Miles.[1] "Tenant" was defined in the lease as Vait and Miles.[2] "Landlord" was defined in the lease as Samuel H. Tanchuck (Samuel) and Betty J. Tanchuck (Betty). Samuel's son, defendant and respondent Marshal Tanchuck (Marshal), who had power of attorney over Samuel's property, managed the building on Samuel's behalf. Both Samuel and Betty are now deceased.

The lease granted Tenant an initial 10-year term that could be renewed for two additional 5-year terms. The lease included a "first rights option" by which Tenant could lease the other half (west side) of the building and/or purchase the entire building under the following circumstances: "Should Landlord or Landlord's relatives not occupy [the west side] as per Exhibit 1 or, should Landlord decide[] to sell Property, Tenant reserves First Rights Option (the 'Option') to lease [the west side] and/or to purchase the entire Property. The Option means that should either of the above occur, Landlord shall first offer to lease [the west side] or sell the Property, as the case may be, to Tenant before Landlord offers to lease or sell to others who are not a party to this Lease. Further, before

---

[1] After signing the lease, the parties signed an addendum that switched the leased portion from one side of the building to the other (from west to east). We refer to the leased portion as the east side of the building, which conforms with the addendum.

[2] More specifically, "Tenant" was defined in the lease as "'This Is a Test' design a d/b/a of Dustin Miles, an individual resident of California and 'AFV Enterprises' a d/b/a of Annette Vait (collectively, the 'Tenant')."

Landlord shall finalize any transaction with another party, Landlord shall offer to lease [the west side] or sell the Property to Tenant at the same rate that the other non-party to this Lease is willing to pay to the Landlord for the lease or purchase, as applicable. [¶] If Tenant leases [the west side] without having to match the rate of another non-party to this lease, Tenant agrees to pay Forty-Eight Thousand U.S. dollars per year for [the lease of the west side] . . . ."

In 2010, the Tanchucks fell behind on their mortgage payments and were faced with a trustee's sale of the property. Vait offered to purchase the property for $870,000. When that offer was refused, Vait offered to lease the other half of the property (the west side) for $4,000 per month, and tendered a check in that amount. When that offer was refused, Vait filed an action against Miles[3] and the Tanchucks for breach of contract and declaratory relief, claiming she had exercised her option to lease the west side of the property. That action was dismissed on the day of trial (December 12, 2011). (*Vait v. Miles* (Super. Ct. L.A. County, 2011, No. SC107959).)

In November 2011, Doniger / Burroughs APC (Doniger) offered to purchase the property from the Tanchucks for $1.75 million in cash. The offer was presented on a standard real estate form and included the usual contingencies for inspections, disclosures, and reports.

Samuel (through Marshal) responded with a counteroffer. In relevant part, the counteroffer required a release and indemnification agreement from Doniger regarding Vait's dismissed lawsuit (SC107959) and the Tenant's claims "as to possession of the entire Property." The counteroffer also required that the sale would be "contingent upon

---

[3] The record indicates that Vait included Miles as a defendant because their business relationship had broken down. In an earlier lawsuit filed by Vait against Miles and the Tanchucks, Miles had taken the position that the October 2009 lease with Vait was void, and that he had a new lease with the Tanchucks that excluded Vait. In that lawsuit, the court declared the October 2009 lease to be valid, and that Vait and Miles were co-tenants with equal rights under the lease (SC107959). The court awarded Vait attorney fees of $36,400 from the Tanchucks in that action.

Tenant's non-acceptance of the Agreement per the Tenant's rights of first offer and first refusal as set forth in the Lease ('Non-Acceptance')."

After Doniger accepted the counteroffer, the documents that formed the purchase offer were forwarded to Vait and Miles, for the purpose of allowing them to exercise the Tenant's right of first refusal. Vait and Miles were advised that time was of the essence due to an impending trustee's sale of the property; that their acceptance was due without any "change, modification, or new condition(s)" within three days (by December 30, 2011); and that their non-acceptance would result in the sale of the property to Doniger.

Neither Vait nor Miles accepted the purchase offer by the stated deadline. Through her attorney, Vait informed Marshal's attorney that the December 30 deadline was unreasonable and invalid because, according to her interpretation of the lease, the Tenant's option rights could be exercised at any time until the close of escrow.

Acting solely on her own behalf, Vait personally e-mailed Marshal several purported acceptances of the purchase offer. In her e-mail dated January 4, 2012, Vait purported to accept the purchase agreement with several additional conditions.[4] At least

_____

[4] The January 4, 2012 e-mail stated in relevant part: "I accept the offer that you forwarded to me on December 27, 2011 (attached) from a deal initiated with [Doniger] November 17, 2011. As with the [Doniger] offer, my acceptance is contingent upon certain disclosures and contingencies to the offer. To that end, please provide and/or note the following so that we may conclude this matter in the timeframe required by Bank of America and the pending foreclosure associated with the property:

"1.     The escrow holder and escrow officer where the [Doniger] deposit is being held so that I can provide same as well as the date escrow was opened and a copy of all escrow instructions.

"2.     A signed Commercial Property Purchase Agreement with all addendum and attachments signed by you as Seller and drafted with myself as Buyer.

"3.     The name of your selected title company.

"4.     Signed Memorandum of Leases by you as required by the Lease for both the East and the West sides of the property previously forwarded to you.

"5.     A contact person for me to immediately schedule access to the entire property at any point this week and next week so that I may schedule inspections. . . . There is, however, the locked area that is the West side of the premises to which I have exercised my option to lease and which you have not honored, and for which you are holding keys. In the event total access is not granted per my requests, I shall have the

4

two of those conditions—that Marshal provide her with a signed memorandum of lease for each side of the property, and that Marshal confirm her tenancy rights at all city and neighborhood meetings—were disputed issues. Alternatively, Vait offered to purchase the property for $870,000 or to settle for $330,000 if her conditions were not acceptable to the seller.

Marshal's attorney, Michael Scott, responded to Vait's purported acceptance of the purchase offer. In his January 5, 2012 letter, Scott disagreed with Vait's assertion that the Tenant's option rights may be exercised until the close of escrow.[5] Scott rejected

_____

longer of the existing removal date of contingencies . . . and/or 10 days from the date a mutually agreeable date of access has been granted to me to remove remaining contingencies.

"6.    I will have a reasonable amount of time (5 days) to remove all contingencies after [Doniger] has removed all of their contingencies per their December 16, 2011 offer and notified escrow in writing of any modified terms to be included in their final offer. All changes and modifications must be done in writing and through escrow with copies to all interested parties . . . In the event any further modifications are made after the point described above, I will again have a reasonable amount of time, once notified in writing of changes to any deal to purchase the property, to finalize my deal.

"7.    Seller agrees to comply with the Lease in confirming Buyer[']s tenancy and lease rights for the premises at any and all City meetings and neighborhood meetings from this day going forward, both publicly and in writing

"8.    The time period set forth in our Agreement for investigations, contingencies, covenants and other obligations shall begin on the Day after [Doniger] confirms in writing their intention to go forward to purchase the property acknowledging my purchase offer, my lease, and my tenancy for purposes of use with City permitting.

"9.    Buyer to provide written verification of full Purchase Price upon Seller's completion of providing the above and acceptance of this offer."

In her January 4 e-mail, Vait also made alternative offers to purchase the property "as is," without further disclosures by seller, for $870,000 in cash, or "to be bought out of the entirety of [her] interest in the property, including [her] purchase option, [her] 20[-]year leases for both the East and West sides of the property, and all entitlements that [she had] procured for [the] property" for $330,000.

[5] Scott's letter stated in relevant part: "There is no 'continuing right of first refusal' or right to wait and accept the Buyer's offer prior to the offer being 'finalized' as you contend. The Buyer's offer presented to your client was final and needed to be accepted according to its terms by the Tenant (and without additional terms or conditions) but was not. Had the Tenant timely done so, then both the Tenant and our

5

Vait's purported acceptance of the purchase offer as untimely and invalid. The acceptance was deemed invalid by Scott because the option belonged to the Tenant (Miles and Vait together), and not to Vait individually, and Vait's additional conditions constituted a counteroffer that was unacceptable to and rejected by the Tanchucks.[6]

client would have been obligated to proceed with the transaction as set forth in the Buyer's offer. Any contention that the Tenant's right of first refusal continues and/or is exercisable only after the Buyer waives its due diligence contingency or that the Tenant's right of first refusal continues and/or is exercisable up until the moment before the Buyer closes escrow is nonsensical and contrary to law. Certainly, the Buyer cannot be expected to complete its due diligence, waive its due diligence contingency and deposit the balance of the purchase price in escrow, but then lose its right to purchase the Property by virtue of the Tenant (immediately before the grant deed records and the sale of the Property to the Buyer closes) swooping in and deciding it wants to purchase the Property by exercising its right of first refusal at the 11th hour."

[6] Scott's letter stated in relevant part: "Next your client conditions the purported exercise of the Tenant's right of first refusal on our client's 'confirming Buyer's (sic) tenancy and lease rights for the premises at any and all City meetings and neighborhood meetings for this day going forward, both publically and in writing.' There is no such requirement in the Lease or at law and this [is] a new term not contained in the Buyer's offer. In addition, your client adds further conditions regarding the timing of investigations, contingencies, etc., following the Buyer's confirmation in writing of their intention 'to purchase the property acknowledging my purchase offer, my lease, and my tenancy for purposes of use with City permitting.' [¶] Finally at the conclusion of the January 4, 2012 email your client actually gets to the heart of the matter. Your client states that if our client refuses the foregoing new conditions, she renews her offer to purchase the Property for $870,000 or to settle for $330,000. Both of these offers were previously rejected and are rejected again."

The letter also stated: "As part of her purported exercise of the Tenant's right of first refusal she improperly demands that the Landlord lease the entire Premises to her and sign a Memorandum of Lease confirming same. Her thinly veiled ultimate plan is clear – she wants the Landlord to lease the entire Property to her during escrow but then she can still disapprove her purchase of the Property during the due diligence period. In this manner she seeks to gain control of the entire Property without being required to actually purchase the Property. Her plan in doing so is to make the Property unsalable by virtue of her now leasing the entire Property versus only one-half. [¶] During the litigation, your client had an opportunity to settle and chose not to do so. Now faced with an offer to purchase the Property for more than double her prior offer, she intends to interfere with the sale to the Buyer and subject the Property to loss by foreclosure sale— all to the significant damage of our client. Your client unilaterally dismissed her lawsuit

6

On January 9, 2012, Vait e-mailed Marshal that she was "interested in purchasing the property," and wanted to "discuss a reasonable timeline to conduct inspections, provide [her with] escrow instructions, and complete the transaction." She told Marshal, "I want to purchase the property in accordance with my rights under the lease." "I look forward to hearing from you and to finding a [resolution] to the Bank of America obligation and your acknowledgment of my lease for both the East and West sides, your signing the contractual memorandums of lease, and negotiating my potential purchase of the property."

On January 18, 2012, Vait e-mailed Marshal: "I again state, further to my attorneys December 30, 2011 letter to your counsel, my January 4, 2012 acceptance letter of the offer to purchase to you, my January 9, 2012 confirmation of acceptance letter of the offer to purchase to you, as well as this letter of confirmation of acceptance of the offer to purchase to you, that I accept and have accepted the offer to purchase the property per the language provided in the offer sent to me December 27, 2011 providing me to close in 90 days." Vait told Marshal that she was tendering $4,000 rent for the *west* side of the property "per my option to lease in the October 2009 lease."

On January 29, Vait sent an e-mail to Doniger, with a copy to Marshal, stating that she intended to purchase the property and had "timely notified Landlords on four separate occasions and I again exercise by this email my option to purchase the property per the offer forwarded to me December 27, 2011 as written." Vait told Doniger that because she had leased *both* sides of the property, "it is not clear to me how you are entitled to use half the space for your offices or for any other purpose."

When her attempts to obtain a signed memorandum of lease and purchase the property went unheeded, Vait filed the present action against Samuel and Miles, recorded a lis pendens on the property, and sought a temporary restraining order (TRO) and preliminary injunction to halt the sale to Doniger. Vait's complaint sought specific performance of her right of first refusal, declaratory relief to establish the validity of her

which would have resolved the issue she still complains about. Her actions are malicious and oppressive and she is responsible for all damages, including punitive damages."

7

lease for the other side (west side) of the property, and a partitioning of her leasehold interest with Miles.

Samuel moved to expunge the lis pendens. He submitted evidence that Vait and Miles had been given an opportunity to accept the purchase offer, but had not done so. After considering the parties' evidence and arguments, the trial court (Judge Gerald Rosenberg) denied the TRO and issued an order expunging the lis pendens.

Escrow for the sale to Doniger closed on February 7, 2012. Disbursements were made from the escrow account to repay the mortgage lender and Vait, whose judgment against the Tanchucks from an earlier action (SC107959) was satisfied. Doniger took title to the property in the name of its wholly owned entity, Igottatellya, LLC.[7] Doniger then leased the west side of the property from Igottatellya and recorded a memorandum of lease for the west side.

After complying with statutory notice requirements, Igottatellya initiated an unlawful detainer action against Vait and Miles based on nonpayment of rent for the east side of the property. (*Igottatellya, LLC v. Vait and Miles* (Super. Ct. L.A. County, 2012, No. SC116156).) The trial court (Judge Lisa Hart Cole) conducted an evidentiary hearing and found Vait and Miles to be jointly and severally liable for approximately one year of rent, totaling $45,384: "Vait and Miles are liable for unlawful detainer and must forfeit and vacate any rights in and to, or in any way related to, the [Property], and any lease or addenda to any lease for the Property. Any lease or addenda thereto held by Vait and/or Miles that relates to the Property is terminated."

Doniger and Igottatellya filed a complaint in intervention in this action, seeking to quiet title to the property based on the failure by Vait and Miles to exercise the Tenant's right of first refusal to purchase the property. Doniger and Igottatellya also sought declaratory relief concerning Vait's purported leasehold interest in the west side of the property that was now leased to Doniger.

_____

[7] Doniger negotiated the terms of the purchase agreement, and created Igottatellya as a holding company for the property.

8

Doniger and Igottatellya moved for summary judgment or, alternatively, summary adjudication of their complaint in intervention. They sought a judicial determination that Tenant did not properly exercise the right of first refusal. They argued that Tenant consisted of Vait and Miles as a single entity; that it was required to exercise the purchase option as a single entity; that Vait's unilateral acceptance of the purchase offer was invalid; and in any event, that Vait's conditions constituted a counteroffer that was rejected by the Tanchucks. The evidence before the court on the summary judgment motion included the correspondence between Vait and Marshal, and Scott's written rejection of Vait's counteroffer as untimely and unacceptable to the Tanchucks.

Vait argued there were triable issues of material fact. She contended the lease required the Landlord to honor the Tenant's right of first refusal until the close of escrow, and that Samuel had violated this provision by failing to re-offer the property according to the final terms of the sale to Doniger. Vait argued that the final terms contained several alterations: title was taken in the name of Igottatellya; Doniger was granted a $50,000 credit for problems (asbestos and lead paint) uncovered during inspections; and Doniger was allowed to finance the purchase with a new loan.

After considering the evidence and arguments of the parties, Judge Rosenberg held that the Tenant had not exercised its right of first refusal: "The unlawful detainer action against Vait determined that she has no rights under the lease and that she is not entitled to occupy the subject property"; "The 'Right of First Refusal' under the lease was granted to Vait and Miles, not to Vait individually"; and "Miles never responded to the December 27, 2011 Right of First Refusal Offer nor is there any evidence that he would have responded; therefore, the 'Right of First Refusal' was never exercised."

Vait filed a voluntary dismissal in favor of Miles, and a first amended complaint against Marshal (both individually and as successor trustee of the Trust), Doniger, and Igottatellya. Vait also moved to proceed against Marshal as Samuel's successor in

9

interest; however, the motion was denied based on Marshal's declaration that he had no interest in Samuel's estate.[8]

Vait alleged in her amended complaint that she had offered to lease the west side of the property from Doniger/Igottatellya for $4,000 per month, but her offer was arbitrarily refused. She sought specific performance of the option to lease the west side, and the option to purchase the entire property at the same rate as Doniger. Vait sought damages in excess of $1 million for breach of contract, intentional interference with contractual relations, and conspiracy.

The trial court sustained defendants' demurrer to the claim for specific performance, and partially sustained the demurrer to the breach of contract claim. The court allowed Vait to proceed with her claim for the alleged breach by Doniger/Igottatellya of her option to lease the west side of the property. The court allowed Vait to amend that aspect of her complaint, but refused to allow any new theories, including the theory that the sale to Doniger/Igottatellya was invalid because Marshal did not become the successor trustee until after the sale was completed.

Vait's second amended complaint, the operative pleading, alleged claims for breach of contract, intentional interference with contractual relations, and conspiracy. As previously directed by the court, the breach of contract claim was limited to the rejection by Doniger/Igottatellya of Vait's offers to lease the west side and to purchase the property at the same rate as Doniger.

The case proceeded to jury trial. At the close of Vait's opening statement, defendants moved for nonsuit. (Code Civ. Proc., § 581c.) They argued the summary

---

[8] Section 377.11 of the Code of Civil Procedure provides: "For the purposes of this chapter, 'decedent's successor in interest' means the beneficiary of the decedent's estate or other successor in interest who succeeds to a cause of action or to a particular item of the property that is the subject of a cause of action."
Marshal also argued that Vait did not comply with the requirements of Code of Civil Procedure section 377.41, which provides that "the court may not permit an action or proceeding to be continued against the personal representative unless proof of compliance with Part 4 (commencing with Section 9000) of Division 7 of the Probate Code governing creditor claims is first made."

10

judgment ruling had established the law of the case that "Tenant" consisted of Vait and Miles as a single entity, and that both co-tenants had to exercise the Tenant's option rights. Because the opening statement did not mention the manner in which Miles had exercised or would have exercised Tenant's option rights, defendants argued this was a fatal defect in Vait's case. Defendants argued: "It would be . . . inconsistent and unjust if the court were to rule that 'Tenant' is defined as both Miles and Vait for purposes of the right of first refusal (as it has), and then rule that 'Tenant' is defined as just Vait for purposes of the option to lease the other half of the space." Defendants asserted that because the intentional interference and conspiracy claims were based on the contract claim, nonsuit was proper as to the entire complaint.

In opposition, Vait argued the Tanchucks and Doniger/Igottatellya had conspired to interfere with her leasehold interests, which would not expire until at least 2019. She also argued Doniger/Igottatellya had interfered with her option to lease the west side of the property, which now was leased to Doniger. Vait claimed that by refusing to provide her with a memorandum of lease for each side of the property, defendants had breached her right to develop the property. She also argued that because Miles had abandoned and/or assigned his leasehold interest to her, he was not a necessary party to this case.

The trial court stated, "I don't know that he abandoned the property." "The lease clearly provides that the tenant is Annette Vait and Dustin Miles. Mr. Miles was originally a defendant in this case. He was dismissed. He is not before the court. He is an indispensable party. He has rights here. I don't know if he has given up those rights. I don't know what arrangement the two of them have, but I don't believe Ms. Vait can go forward and make any of these claims without some determination of Mr. Miles's position in all of this." "I am still stuck with what to me is, I have an indispensable party, who is a tenant. He comes within the definition of 'Tenant' in this case, and he is not in this case. He was dismissed out of this case. There has been no determination of anything connected with him. It is the court's position that she can't go forward with any of these claims without having Mr. Miles before the court."

11

The court granted defendants' motion for nonsuit and dismissed the jury. This timely appeal was taken from the judgment of dismissal.[9]

## DISCUSSION

Code of Civil Procedure section 581c, subdivision (a) states: "Only after, and not before, the plaintiff has completed his or her opening statement, or after the presentation of his or her evidence in a trial by jury, the defendant, without waiving his or her right to offer evidence in the event the motion is not granted, may move for a judgment of nonsuit."

Like a demurrer, a motion for nonsuit "'concedes the truth of the facts proved, but denies as a matter of law that they sustain the plaintiff's case. A trial court may grant a nonsuit only when, disregarding conflicting evidence, viewing the record in the light

[9] The judgment stated: "On February 5, 2013 this Court granted summary judgment in favor of Plaintiffs-In-Intervention Igottatellya LLC and Doniger / Burroughs APC and found as follows: (1) 'The Unlawful Detainer action against Vait determined that she has no rights under the lease and that she is not entitled to occupy the subject property,' and (2) that 'the "Right of First Refusal" under the lease was granted to Vait and Miles, not to Vait individually. The evidence is undisputed that Miles never responded to the December 27, 2011 Right of First Refusal Offer, nor is there any evidence that he would have responded; therefore, the Right of First Refusal' was never exercised.

"On April 25, 2013 this Court sustained the demurrer of Defendants Doniger / Burroughs APC, Igottatellya LLC, and Marshal Tanchuck to Plaintiff's first cause of action for specific performance without leave to amend.

"On September 25, 2013 this case proceeded to trial on Plaintiff's three remaining causes of action for (1) breach of contract, (2) interference with contractual relations, and (3) conspiracy as against Doniger / Burroughs APC, Igottatellya LLC, and Marshal Tanchuck, individually and as Successor Trustee for the Samuel H. and Betty Tanchuck Family Trust of 12-2-1996, and a jury was empanelled. Defendants' timely made a nonsuit motion as to all three remaining causes of action which was granted.

"Accordingly, Judgment is hereby entered as follows:

"(1) Judgment is entered in favor of Doniger / Burroughs APC, Igottatellya LLC, and Marshal Tanchuck (both individually and as successor trustee for the Samuel [H.] and Betty Jean Tanchuck Family Trust of 12-2-1996), and against Plaintiff Annette Vait, on each cause of action asserted in the operative Complaint and Complaint-In-Intervention . . . ."

12

most favorable to the plaintiff and indulging in every legitimate inference which may be drawn from the evidence, it determines there is no substantial evidence to support a judgment in the plaintiff's favor.' (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 27–28 (*Edwards* ), italics omitted.)  [¶] On appeal, '[w]e are bound by the same rules as the trial court.  Therefore, on this appeal we must view the evidence most favorably to appellants, resolving all presumptions, inferences and doubts in their favor, and uphold the judgment for respondents only if it was required as a matter of law.' (*Edwards*, *supra*, 53 Cal.App.4th at p. 28.)" (*Cossman v. DaimlerChrysler Corp.* (2003) 108 Cal.App.4th 370, 375–376.)

Where, as here, "a nonsuit is based on the plaintiff's opening statement, we assume plaintiff can prove all the favorable facts alleged.  [Citations.]  The court may consider as part of the opening statement exhibits that would probably become evidence at trial.  [Citation.]  A nonsuit on the opening statement is proper only when the court concludes that there will be no evidence which would support a judgment in favor of the plaintiff.  [Citations.]  [¶] The grounds for the nonsuit motion should be clearly specified to give the plaintiff an opportunity to cure any defects.  [Citations.]  The plaintiff must be given an opportunity to present all the facts he expects to prove before a nonsuit is proper.  [Citations.]  On appeal we will not consider any ground for the nonsuit not advanced in the trial court, except one which identifies an incurable defect.  (*Lawless v. Calaway* (1944) 24 Cal.2d 81, 92–94.)" (*Loral Corp. v. Moyes* (1985) 174 Cal.App.3d 268, 272–273.)

The record on appeal contains numerous exhibits that presumably would have been presented at trial.  Based on those exhibits, Vait contends the trial court's stated reason for granting the motion for nonsuit—that Miles is an indispensable party—is erroneous for at least three reasons:  the lease allowed her to exercise the Tenant's option on her own behalf; Miles abandoned his leasehold interest; and Miles assigned his leasehold interest to her.

Based on our independent review of the record, we conclude there are triable issues of material fact as to whether Miles had abandoned or assigned his leasehold

13

interest to Vait. If a trier of fact were to find there was an abandonment or assignment by Miles, then the case law would support Vait's contention that she may exercise the purchase option on her own behalf. (See *Erich v. Granoff* (1980) 109 Cal.App.3d 920 [plaintiff and her new husband were allowed to exercise a lease option that originally belonged to plaintiff and her former husband].) We therefore do not agree that the nonsuit should be upheld on the stated theory that Miles is an indispensible party as a matter of law.

Nevertheless, we conclude that the nonsuit must be affirmed due to another and incurable defect in Vait's case: the Tenant never exercised the purchase option for other reasons. In light of those other reasons, we agree with the summary judgment and nonsuit rulings.

Vait has not and cannot prove that she accepted the purchase offer in a valid manner, or that the Tanchucks accepted her counteroffer. "It is, of course, basic hornbook law that the existence of a contract is a necessary element to an action based on contract, regardless whether the plaintiff seeks specific performance or damages for breach of contract. [Citations.] Consent of the parties is essential to the existence of a contract. (Civ. Code, § 1550.) Consent must be free, mutual and 'Communicated by each to the other.' (Civ. Code, § 1565.) [¶] 'An acceptance must be absolute and unqualified, or must include in itself an acceptance of that character which the proposer can separate from the rest, and which will conclude the person accepting. A qualified acceptance is a new proposal.' (Civ. Code, § 1585.) [¶] Contract formation is governed by objective manifestations, not subjective intent of any individual involved. [Citations.] The test is 'what the outward manifestations of consent would lead a reasonable person to believe.' [Citation.]" (*Roth v. Malson* (1998) 67 Cal.App.4th 552, 557.)

The correspondence comprising Vait's purported acceptance of the purchase offer and Scott's unequivocal rejection conclusively demonstrates that no purchase contract was created between Vait and the Tanchucks. Vait's purported acceptance was conditioned on at least two new and material items—a signed memorandum of lease for each side of the property, and an acknowledgement of Vait's tenancy rights at all city and

14

neighborhood meetings. Vait's e-mails created a counteroffer that could be accepted or rejected by the seller. It was never accepted. Consent is essential to the formation of a contract, and there is no objectively reasonable basis upon which to conclude Vait's additional conditions, which were expressly rejected by Scott, did not vary the terms of the purchase offer.

Vait contends that even assuming her January 4 e-mail contained additional demands that she was not entitled to make, in her subsequent e-mails she corrected her mistake and accepted the terms of the purchase agreement. She argues that because her subsequent e-mails clarified her desire to purchase the property according to the terms of the purchase agreement, there was sufficient evidence to create a triable issue of material fact.

Vait relies on *Riverside Fence Co. v. Novak* (1969) 273 Cal.App.2d 656, 662, which stated: "'If the person offering to perform is acting in good faith, and makes the mistake of demanding something to which he is not entitled, he ought to be given the same opportunity to recede from such demand that he is allowed for tendering the correct amount where he has tendered too little, or the right thing where he has tendered the wrong thing. . . .' [Citations.] The foregoing principle has been held to be applicable to a good faith tender of performance in the exercise of an option. [Citations.] In *Layton v. West* [(1969) 271 Cal.App.2d 508], the court stated at p. 511: 'Any tender of performance, including the exercise of an option, is ineffective if it imposes conditions upon its acceptance which the offeror is not entitled to demand. [Citations.] However, the imposition of such conditions is waived by the offeree if he does not specifically point out the alleged defects in the tender. [Citations.] The rationale of the requirement of specific objection is that the offeror should be permitted to remedy any defects in his tender; the offeree is therefore not allowed to remain silent at the time of the tender and later surprise the offeror with hidden objections. [Citation.]'" (See also *C. Robert Nattress & Associates v. CIDCO* (1986) 184 Cal.App.3d 55, 67 [same].)

These cases do not assist Vait, because her subsequent e-mails do not support a reasonable inference that she was prepared to meet the terms of Doniger's purchase

15

agreement.  Her $870,000 counteroffer fell significantly short of Doniger's $1.75 million offer, and she never relinquished her disputed claim for a lease over the west side of the property.  Her e-mails, viewed in the light most favorable to Vait, do not support a reasonable inference that she was exercising the purchase option in good faith.

Second, we conclude Vait is incapable of proving that she had a valid lease for the other half of the property.  In its unlawful detainer action (SC116156), Igottatellya recovered a judgment against Vait and Miles that terminated their lease based on their nonpayment of rent.  Payment of rent is one of the preconditions to a tenant's right to renew a lease.  (*Klepper v. Hoover* (1971) 21 Cal.App.3d 460, 464.)  And payment of rent is a precondition to a tenant's right to exercise an option to lease additional space. The record is undisputed that when Vait sought to lease the west side from Doniger/Igottatellya, she owed back rent for the east side of the property.  Because Vait's judgment against the Tanchucks was extinguished by the payment from Doniger's escrow account, Vait had no basis to claim an offset against unpaid rent when she attempted to lease the west side from Doniger/Igottatellya.

Third, Vait is incapable of proving that after the property was sold to Doniger/Igottatellya, there was an attempted sale or lease of the property that triggered the Tenant's right of first refusal.  Neither the taking of title in the name of Doniger's wholly owned entity, Igottatellya, nor the lease of the west side of the building to Doniger constituted an act that triggered a right of first refusal under the lease to Vait and Miles.  (See *Hartzheim v. Valley Land & Cattle Co.* (2007) 153 Cal.App.4th 383, 392.)

Finally, Vait has not shown an abuse of discretion in the denial of her requests to amend the complaint to allege a new theory, or to proceed against Marshal as Samuel's successor in interest.  These issues are moot in light of Vait's inability to prove her substantive claims.

16

**DISPOSITION**

The judgment is affirmed.  Respondents are awarded their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EPSTEIN, P. J.

We concur:


MANELLA, J.


COLLINS, J.